UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JERMAINE JONES, | : | CIVIL CASE NUMBER |
| *Plaintiff,* | : | |
| | : | 3:14-cv-01513 (VLB) |
| v. | : | |
| | : | JANUARY 7, 2018 |
| UNITED STATES, | : | |
| *Defendant.* | : | |

MEMORANDUM OF DECISION DENYING PETITION FOR RELIEF UNDER 28 U.S.C. § 2255 [DKT. 1]

Petitioner, Jermaine Jones ("Jones" or "Petitioner"), brings this *pro se* petition for habeas relief under 28 U.S.C. § 2255, asserting twelve ineffective assistance of counsel claims against his counsel who represented him for trial and sentencing. For the foregoing reasons, this Motion to Vacate, Set Aside, or Correct Sentence, [Dkt. 1], is DENIED.

Background

On May 20, 2010, Mr. Jones was arrested in Florida for charges stemming from the initial Indictment issued on April 1, 2010. *See United States v. Williams*, Case No. 10-cr-00080 (VLB) (hereinafter "*Williams*"), [Dkt. 1 (Sealed Indictment)]. The Indictment charged Mr. Jones and his two co-defendants, Sheikera Williams and Michael Jones, with 70 counts of bank fraud in violation of 18 U.S.C. § 1344, one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349, and three counts of aggravated identity theft in violation of 18 U.S.C. § 1028A. At the arraignment on June 29, 2010, Mr. Jones entered a plea of not guilty and was appointed Frank Riccio, Jr. ("Attorney Riccio") as CJA counsel. *See Williams*, [Dkt. No. 13 and 14 (Attorney Appearance)]. Mr. Jones was ordered detained.

After several continuances, the trial was ultimately scheduled for November 2011. Co-defendant Williams pleaded guilty on October 3, 2011. *See Williams*, [Dkt. No. 104 (Change of Plea Hearing)]. A Superseding Indictment was issued on October 11, 2011, which decreased the total counts and instead included seven counts of bank fraud, one count of conspiracy to commit bank fraud, and seven counts of aggravated identity theft, all in violation of the same statutes as previously stated. *See Williams*, [Dkt. No. 115 (Superseding Indictment)].

The trial began on November 2, 2011 and the jury rendered its verdict on November 17, 2011: guilty on all counts. *See Williams*, [Dkt. No. 182 (Jury Verdict)]. Mr. Jones was sentenced on May 16, 2012 and received 216 months' imprisonment on the bank fraud and conspiracy counts to run concurrently; 24 months' imprisonment on the aggravated identity theft counts to run consecutive to the 216 months; 60 months' supervised release; a special assessment of $1,500.00; and $237.790.00[1] payable at a rate of not less than $25.00 per week. *See Williams*, [Dkt. No. 245 (Judgment)].

By and through Attorney Riccio, Mr. Jones appealed his conviction and sentence. *See Williams*, [Dkt. No. 238 (Notice of Appeal)]. The Second Circuit affirmed the conviction and sentence in summary order filed February 26, 2014.

---

[1] The Court has reviewed the transcript of the sentencing hearing, the Statement of Reasons, and the Judgment. At the hearing, the Court ordered Mr. Jones to pay restitution in the amount of $237,790 payable at a rate of $25 per week, *see* Dkt. 274 (Sentencing Tr.) at 43:5-12], the value of which is stated in the Statement of Reasons, *see* [Dkt. 243 (Stmt of Reasons) at 4 of PDF]. The Judgment does not reflect this amount and instead lists the restitution amount to be $237,936. The Court finds that the Judgment is in error and contemporaneously herewith files an Amended Judgment.

*See Williams*, [Dkt. No. 291 (Mandate)]. Specifically, the Second Circuit upheld his conviction for failure to demonstrate insufficient evidence at trial, ruling, "In short, plentiful evidence was presented at trial of Jones's intent to join a conspiracy to commit bank fraud, his intent to commit the substantive crime of bank fraud, and his knowledge that the means of identification at issue belonged to another person." *Id.* at 4. In addition, the Second Circuit upheld his sentence and found that this Court did not err in (1) calculating the loss amount pursuant to § 2B1.1(b)(1), (2) applying a two-level enhancement for "sophisticated means" under § 2B1.1(b)(10), and (3) applying a four-level enhancement for 50 fifty or more victims pursuant to § 2B1.1(b)(2)(B). *See id.* at 6-7. Thereafter, Mr. Jones timely filed this habeas petition before the Court.

## Legal Standard

Section 2255 enables a prisoner is federal custody to petition a federal court to vacate, set aside, or correct the sentence. 28 U.S.C. § 2255(a). Relief under Section 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in complete miscarriage of justice." *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996) (internal quotation marks and citation omitted). Section 2255 provides that a district court should grant a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

Claims for ineffective assistance of counsel are analyzed under the two part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, a

movant must both allege facts demonstrating that "counsel's representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687–88, 694. As to the first showing, a movant must demonstrate that counsel's performance "amounted to incompetence under 'prevailing professional norms'" rather than demonstrating that the performance "deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). As to the second showing, a movant must demonstrate "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Analysis

Mr. Jones brings 12 ineffective assistance of counsel claims, which raise instances that occurred during both trial and sentencing. The Court addresses each claim in turn.

I. **Failure to Raise a *Batson* Challenge**

Mr. Jones claims the jury pool included approximately five African Americans and the Government used its peremptory challenges to strike all but one of these individuals. The use of peremptory challenges, Mr. Jones contends, was done "in a systematic racial[ly] mot[i]vated manner to [e]nsure that neither one of the African-American prospective jurors were actually seated on the jury." [Dkt. 1-1 (Petitioner's Mem. Law) at 8]. As a result, the jury was comprised entirely of white people, and Mr. Jones argues counsel acted deficiently in failing to object to the jury composition "[i]n light of the [G]overnment's theory of the case, that

Movant sought out, and only used, white females to commit the crimes for which he was on trial for. . . ." *Id.*

The Government disputes the validity of Mr. Jones's *Batson* challenge claim for the primary reason that he fails to establish a *prima facie* case of purposeful discrimination. [Dkt. 14 (Gov. Response) at 17]. The Government points out that Mr. Jones does not cite the transcript or another document identifying the demographics of the venire or the Government's peremptory strikes. Even if he were to satisfy the *prima facie* case, the Government contends he nonetheless fails to establish prejudice. *Id.* at 18.

*Batson v. Kentucky*, 476 U.S. 79 (1986) created a three-step procedure for courts to determine "whether a peremptory strike has been exercised in a racially discriminatory manner." *United States v. Diaz*, 176 F.3d 52, 76 (1999). First, a court must determine whether the petitioner makes out "a *prima facie* showing that the prosecution has exercised its peremptory strike on the basis of race." *Id.* If defendant satisfies the first step, the court must then evaluate "whether the government has satisfied its burden of coming forward with a race-neutral explanation for striking the juror in question." *Id.* If so, the court evaluates "whether the defendant has carried his burden of persuasion of proving purposeful discrimination." *Id.*

There are several ways in which a petitioner can make a *prima facie* showing of racial discrimination. A court should consider "how many members of the cognizable racial group are in the venire panel from which the petit jury is chosen, the pattern of strikes against racial group jurors in the particular venire, the

prosecutor's statements and questions during selection, as well as any other relevant circumstances." *Tankleff v. Senkowski*, 135 F.3d 235, 249 (2d Cir. 1998) (addressing *prima facie* showing in the *Powers* context). "When the asserted prima facie case is based upon the use of strikes to exclude all or nearly all of the members of a particular racial group, the record need only include how many members of that group were in the venire, and how many of those were struck." *Jones v. West*, 555 F.3d 90, 99 (2d Cir. 2009).

Mr. Jones has not provided the Court with any evidence supporting his claim. Nonetheless, the Court independently assessed the venire documents kept by the Clerk. The jury pool contained only two individuals who identified as African American. The first person was randomly assigned pool number 39, and the Court, not the Government, struck him for cause. The second person was randomly assigned pool number 64, and she was chosen as the third alternate. It is worth noting the twelfth juror was assigned pool number 49, and therefore the random nature of the jury selection process essentially made it impossible for the alternate to have been picked as a juror given she was questioned 15 people later. The Court also notes the Government used peremptory challenges on eight people, seven who were listed as White and one who was listed as Other. One chosen juror was also listed as Other. The objective evidence does not support a finding that the Government's actions were racially motivated or that Attorney Riccio acted below an objective standard of reasonableness in failing to object to petit jurors having been stricken. Neither Mr. Jones nor the record offer any factual support for this claim and therefore a hearing is not warranted. *See Strickland*, 466 U.S. at 687-88.

II.    <u>Failure to Object to Discovery</u>

Mr. Jones claims the Government withheld exculpatory evidence as demonstrated by the changes in the Superseding Indictment, which reduced the number of Defendants from three to two and the number of bank fraud counts from 74 to seven.  [Dkt. 1-1 at 12-13].  Specifically, Mr. Jones believes the Government withheld all discovery pertaining to Counts 9, 11, 13 and 15 of the Superseding Indictment.  *Id.*  The Government maintains that it "provided early and fulsome discovery in this case, beginning in July 2010," and that Mr. Jones's characterization demonstrates a misunderstanding of the discovery process rather than any potential misconduct.  *See* [Dkt. 14 at 19].

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court established the requirement to disclose all evidence that could be considered exculpatory or bearing on a defendant's innocence or guilt.  The Government's obligations under *Brady* are well-established. The prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment. *Id.* at 87. This duty covers not only exculpatory evidence, but also information that could be used to impeach a key government witness.  *See Giglio v. United States*, 405 U.S. 150, 154 (1972).  *Brady* does not, however, require the prosecution to disclose *all* exculpatory and impeachment evidence; it need disclose only that, which "if suppressed, would deprive the defendant of a fair trial."  *United States v. Bagley*, 473 U.S. 667, 675 (1985).  In the context of *Brady*, a defendant is deprived of a fair trial only where there is a reasonable probability that the government's suppression affected the outcome of the case, *see id.* at 682, or

where the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Mr. Jones has failed to identify any evidence withheld by the Government, much less any evidence that would have changed the outcome of the trial and the withholding of which thus deprived him of a fair trial. It appears as if the evidence Mr. Jones challenges was not even "favorable to the accused" as his position is the Government "failed to disclose any discovery whatsoever to support its inclusion of Counts 9, 11, 13, and 15 of the Superseding Indictment. . . ." [Dkt. 1-1 at 13]. The Government avers that it timely disclosed all discovery beginning in June 2010, which relate to the Superseding Indictment filed October 2011.[2] *See* [Dkt. 14 at 22]. The filing of a Superseding Indictment, which reduced the total number of counts and adjusted the nature of the counts, does not inherently mean discovery was withheld. Mr. Jones clearly has not met his burden to establish deficient performance because he has not alleged any facts demonstrating how the absence of an objection on these grounds means counsel's performance fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88; *Lewis v. Feliciano*, No. 3:09cv20171 (DJS), 2012 WL 1247264, at *9 (D. Conn. Apr. 13, 2014) (stating that "[a]bsent any indication as to what the witnesses would have stated

---

[2] The Government has provided the Court with evidence of rental car records disclosed to Defendant prior to trial as well as summary charts of checks and other records, some of which are expressly referenced in the Superseding Indictment and which were some of the Government's trial exhibits. *See Williams*, [Dkt. 115]. To the extent Petitioner believes the Government did not disclose *any* evidence relating to the Superseding Indictment, *see* [Dkt. 1-1 at 13], this contention is dispelled by the Government's Exhibit 6, *see* [Dkt. 14-6 (Ex. 6, Trial Exs.)].

or what the evidence would have shown, Lewis failed to meet [his] burden" of demonstrating deficient performance on *Brady* grounds).  Therefore, the Court need not address the prejudice prong.

### III.  Failure to File Motion to Sever

Mr. Jones criticizes defense counsel's failure to file a motion to sever his case from that of his co-defendant, Michael Johnson.  According to Mr. Jones, severance would have been essential because he stopped participating in the conspiracy after his arrest and detention.  Severance, the Government contends, is not warranted simply because a defendant did not participate in the entire conspiracy, because the critical question is whether a joint trial prejudiced the movant and Mr. Jones has not addressed this factor.  *See* [Dkt. 14 at 22].

Rule 14 of the Federal Rules of Criminal Procedure provides that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  There is a clear preference for a joint trial where "the defendants are alleged to have participated in a common plan or scheme."  *United States v. Fazio*, 770 F.3d 160, 166 (2d Cir. 2014) (citing *United States v. Salameh*, 152 F. 3d 88, 115 (2d Cir. 1998)).

"[I]t is well-settled that withdrawal from a conspiracy is an affirmative defense for which the defendant bears the burden of proof at trial."  *United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 2011).  A conspirator's membership in a conspiracy is presumed to continue until he affirmatively withdraws or the

conspiracy ends. *United States v. Flaharty,* 295 F.3d 182, 192 (2d Cir. 2002). The defendant has the burden of proving withdrawal. *United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000). Here, Mr. Jones fails to establish that his involuntary incapacitation even constitutes withdrawal. Evidence of imprisonment can, but does not necessarily, constitute withdrawal from a conspiracy. *See Flaharty*, 295 F.3d at 192-93. To withdraw from a conspiracy, a person must take some affirmative action either by "the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964); *Berger*, 224 F.3d at 118 (same). To withdraw, an individual must not take any subsequent acts to promote the conspiracy. *United States v. Basciano*, 634 F. App'x 832, 834 (2d Cir. 2015). At trial, evidence that identity documents stolen by Jones was used by his co-conspirators when he was not present.

Severance is not automatic in circumstances where a defendant is incarcerated during the conspiracy, particularly where there is substantial evidence of the defendant's involvement in the conspiracy prior to incarceration and withdrawal relates "only to the improper use against him of subsequent acts and declarations of coconspirators." *See United States v. Agueci*, 310 F.2d 817, 838-39 (2d Cir. 1962); *United States v. Bless*, 422 F.2d 210, 213 (2d Cir. 1970). A court is to sever defendants "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Astra Motor Cars*, 352 F. Supp. 2d 367, 369-70 (E.D.N.Y. 2005) (quoting *Zafiro v. United States*,

506 U.S. 534, 539 (1993)).  Such a determination is left to the sound discretion of the court.  *Zafiro v. United States*, 506 U.S. at 539.

Mr. Jones has not presented the Court with any evidence that he was denied a fair trial.  After reviewing the trial transcripts, the Court finds that Defendants participated in a "common scheme or plan," *Fazio*, 770 F.3d at 166, and that there was substantial evidence of his involvement in the conspiracy, *see Agueci*, 310 F.2d at 838-39.

Moreover, Mr. Jones's withdrawal was relevant "only to the improper use against him of subsequent acts and declarations of coconspirators," *see Agueci*, 310 F.2d at 838-39, which he freely acknowledges as relevant to the length of time he participated in the conspiracy, *see* [Dkt. 5 (Jones Decl.) ¶ 15].  Mr. Jones points to no improper use of the evidence.

The Second Circuit's mandate on Mr. Jones's appeal concluded that "plentiful evidence was presented at trial" of Mr. Jones's intent to join the conspiracy and commit the substantive offenses with the knowledge that the means of identification belonged to other people. *See* [Dkt. 291 at 4].

Attorney Riccio declares that he considered severance and advised Mr. Jones that courts typically deny motions to sever.  *See* [Dkt. 19 (Riccio Aff.) at 7 of PDF].  Counsel did not act unreasonably when he elected not to move to sever defendants in light of the facts of the case, his understanding of prevailing case law, and the unlikelihood that a motion to sever would have been granted.  *See id.*

Mr. Jones similarly fails to show prejudice in light of the fact that withdrawal was relevant only to subsequent activities and the loss amount attributable to him,

because despite his incarceration the jury would have been reasonably able to consider the evidence as to the guilt of Mr. Johnson and Mr. Jones. *See United States v. Moten*, 564 F.2d 620, 627 (2d Cir. 1977).

## IV.    Failure to Sequester Special Agent Mahar

Mr. Jones believes defense counsel was ineffective in failing to demand Special Agent Ryan Mahar be sequestered from the trial. [Dkt. 1-1 at 15]. He argues Agent Mahar participated in the investigation and "[p]rejudice resulted when the agent controlled the flow of evidence for the prosecution, in such a manner so as to actually prosecute the case, thus denying Movant of a fair trial." *Id.* The Government does not dispute Agent Mahar's presence during trial but contends that such presence is permitted by the Federal Rules of Evidence and case law. [Dkt. 14 at 25].

Rule 615 of the Federal Rules of Evidence requires a court to sequester a witness upon a party's request or on its own "so that they cannot hear other witnesses' testimony." One exception to this rule applies where "an officer or employee of a party that is not a natural person [is] designated as the party's representative by its attorney." Fed. R. Evid. 615(b). In keeping with this rule, a "district court has discretion to exempt the government's chief investigative agent from sequestration, and it is well settled that such an exemption is proper under Rule 615[b], deeming the agent–witness a 'representative' of the government." *United States v. Lee*, 834 F.3d 145, 162 (2d Cir. 2016) (internal quotation marks and citations omitted); *see Griffith v. United States*, No. 03 Civ. 7860(HB), 03 Civ. 7861(HB), 2005 WL 245071, at *6 (S.D.N.Y. Oct. 6, 2005) ("In light of such well-settled

precedent [establishing the court's discretion] it is reasonable for the Griffiths' counsel not to have objected to the agent's presence in the courtroom."). Therefore, defense counsel was not deficient for failing to request sequestration because Agent Mahar would have fit within the ambit of the Rule 615(b) exception. *See United States v. Lott*, 365 F. App'x 946, 950 (10th Cir. 2010) (ruling defense counsel's failure to seek sequestration of government's case agent did not constitute ineffective assistance of counsel because the witness would have fallen within a Rule 615 exception). Mr. Jones fails to provide a legal or factual basis that warrants a finding of deficiency or prejudice.

## V. Failure to Object to Special Agent's Expert Testimony and the Lack of Foundation

Mr. Jones bases this next ineffective assistance of counsel claim on defense counsel's failure to object to the foundation laid for Agent Mahar to testify as an expert and his subsequent testimony. *See* [Dkt. 1-1 at 17]. Agent Mahar's classification as an expert and associated testimony purportedly "served no purpose but to bolster the credibility of the witnesses whose credibility is/was questionable at best." *Id.* at 18. The Government argues that it laid a proper foundation for Agent Mahar's testimony as an expert and that his testimony in multiple capacities was permissible. *See* [Dkt. 14 at 26].

With respect to the foundation issue, the Government established that Agent Mahar holds a Bachelor's degree from the University of Nashville, Tennessee and that he became a forensic examiner for the United States Secret Service in 2006. [Dkt. 267 (Tr. 11/14/11) at 225:17-226:2]. He received approximately 140 hours of special training in cell phone forensics, which has taught him how to recover digital

13

evidence from various devices. *Id.* at 226:3-11. In total, he has analyzed over 50 cell phones. *Id.* at 226:12-14. He had previously been qualified as an expert in cell phone forensics in Connecticut state court. *Id.* at 226:21-25. After discussing the nature of the expert testimony at side bar, neither defense counsel for Mr. Johnson nor defense counsel for Mr. Jones objected to his determination as expert. *See id.* at 227:3-20. Mr. Jones has not brought forth any factual evidence or a legal basis indicating the Agent Mahar is not "qualified as an expert by knowledge, skill, experience, training or education. . . ." Fed. R. Evid. 702. The Court finds the Government sufficiently laid a foundation for Agent Mahar to testify as an expert and that Attorney Riccio's performance did not fall below prevailing professional norms in abstaining from objection. *See Harrington*, 562 U.S. at 105.

Mr. Jones's contention that his qualification as an expert bolstered his lay witness testimony requires a closer analysis, but ultimately it does not prevail. In certain circumstances, a case agent's testimony as expert carries some risks of juror confusion, *see* Fed. R. Evid. 403, because "[s]ome jurors will find it difficult to discern whether the witness is relying properly on his general experience and reliable methodology, or improperly on what he has learned of the case." *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003). Accordingly, there exists a risk that a case agent testifying about both an expert opinion and the facts of the case "may easily elide these two aspects of their testimony." *Id.* at 55-56. Indeed, "[g]iven their role, their perspective, and their focus on the facts, these case agent experts are more likely to stray from the scope of their expertise and to testify about

other aspects of the case, including the divulging of hearsay evidence." *Id.* at 55-56.

Here, the potential for juror confusion was minimal because the Government questioned Agent Mahar on a very narrow set of issues; he testified almost exclusively to the summarization of certified records and the content of documents that were submitted into evidence. *See generally* [Dkt. 267 at 206:15-242:11; Dkt. 268 at 6:11-24:24]. Agent Mahar did not provide hearsay evidence or stray from the scope of his expertise. *Id.* Mr. Jones fails to demonstrate how counsel's failure to object would be deficient, let alone prejudicial, to his case.

## VI.  Failure to Object to Evidence at Trial

Mr. Jones lists in four groups several exhibits that were introduced without objection and contends that the failure to object constituted ineffective assistance of counsel. He does not identify the objections that could have been made or establish why the failure to object would have been deficient.

First, Mr. Jones argues Attorney Riccio was ineffective for allowing the Government's Exhibit 301 to be admitted and to subsequently be amended. *See* [Dkt. 1-1 at 18]. This exhibit is a summary chart of Exhibits 1-100 and was admissible pursuant to Fed. R. Evid. 1006, which enables a proponent to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Because the Court admitted the documents pursuant to Fed. R. Evid. 1006, *see* [Dkt. 260 (Tr. 11/2/11) at 3:7-23], and the underlying documents were admitted as exhibits as well, Mr. Jones has not shown how, if at all, the summary charts failed

to reflect accurately the underlying exhibits. Consequently, he has failed to show how Attorney Riccio acted below his objective standard of reasonableness in failing to object to the introduction of unobjectionable exhibits which merely summarized voluminous admissible exhibits. *See Strickland*, 466 U.S. at 687-88. There is no basis for the Court to conclude that Attorney Riccio performed deficiently by allowing the summary chart to be amended as trial continued. The revisions certainly did not amount to anything serious enough to undermine the outcome of trial. *See Strickland*, 466 U.S. at 964.

Second, Mr. Jones contends that Exhibits 23-A-1, 23-B-1, 24-A-1, 24-B-1, 25-A-1, 25-B-1, 26-B-1, 27-A-1, and 27-B-1 should not have been introduced as they were notes referred to by witness Marie Martin. *See* [Dkt. 1-1 at 18]. At the beginning of the direct examination, the Government handed Ms. Martin a binder of Exhibits 23 through 28, *see* [Dkt. 261 (Tr. 11/3/11) at 38:2-10], and the record reflects these exhibits were copies of checks, not notes, *see id.* at 38:2-40:19]. In addition, Ms. Martin brought copies of returned checks "along with the reason . . . that it was returned . . . from a second bank." *See* [Dkt. 261 at 46:4-13]. Ms. Martin testified that the check "is the same as . . . the original check when it was negotiated" but "[i]t's before we knew it was going to return." *Id.* She also testified, "When it's returned it looks the same but they just put a return reason." *Id.* These documents were admitted under the business records exception as the Government established they were version of other exhibits created by the employee with knowledge near the time of the transaction, they were kept in the ordinary course of business, and they were made as a regular practice of that

activity.  *See* Fed. R. Evid. 803(6)(A)-(C); *see* [Dkt. 261 at 38:3-65:1; 47:15-48-14]. The fact that there is a stated reason for the return does not mean the documents were not admissible.  The record indicates defense counsel possessed these documents prior to the trial, and defense counsel's copies were submitted into evidence.  *Id.* at 49:18-50:7.  Attorney Riccio did not act deficiently because these documents were admissible.[3]

Third, Mr. Jones challenges Attorney Riccio's stipulation to Exhibits 140A-C and 154A-C.  *See* [Dkt. 1-1 at 19].  Witness Susan McGregor testified that Exhibits 140A-C were her driver's license, debit card, and a check made out in her name. *See* [Dkt. 264 (Tr. 11/8/11) at 54:3-24].  Witness Mary Willingham testified that Exhibits 154A-C were her driver's license, credit card, and military identification. *See id.* at 48:21-49:9].  The parties stipulated to the admissibility of Exhibits 140A-C and 154A-C, which were "similar to exhibits previously stipulated for admission as full exhibits."  *Id.* at 56:12-23.  Regardless, these documents would have been admissible as the witnesses were the owners of the documents and adequately identified the evidence in a manner "sufficient to support a finding that the item is what the proponent claims it is."  *See* Fed. R. Evid. 901(a).  Attorney Riccio acted as a reasonable attorney in stipulating to the admission.

Fourth, Mr. Jones claims that Exhibits 14, 23, 52, and 96 should not have been admitted because they supported Counts 9, 11, 13, and 15 and had never been disclosed to him prior to trial.  *See* [Dkt. 1-1 at 19].  These exhibits were checks

---

[3] Mr. Jones also fails to direct the Court to the Avis Budget sheet substitutions to which he objects.  The Court will not address his reference to this claim, without more.

submitted into evidence, which were also featured in the summary chart. Attorney Riccio did not perform below an objective standard of reasonableness for the same reasons as the above exhibits pertaining to Ms. Martin's testimony. *See* Dkt. 260 at 61:9-62:14 (admitting Exhibit 96 as a business record); Dkt. 261 at 38:3-40:14, 67:1-69:20, 127:24-129:19 (admitting Exhibits 14, 23, and 52 as a business record)]. Assuming Mr. Jones did not have the opportunity to review these documents prior to trial, these checks were just four of the 100 checks submitted into evidence and would not have "undermine[d] confidence in the outcome." *See Strickland*, 466 U.S. at 694. Accordingly, this ineffective assistance of counsel claim fails.

**VII.**  <u>Failure to Advise of Right to Testify</u>

It is Mr. Jones's position that Attorney Riccio failed to advise him of his right to testify. *See* [Dkt. 1-1 at 20-21]. Specifically, Mr. Jones claims that "counsel knew [he] wanted to testify and tell his side of the story regarding the offense" and that "counsel knew that Movant only proceeded to a jury trial whereas he could testify regarding loss amounts attributed to him. . . ." *Id.* at 20. The Government objects to Mr. Jones's claim on two key bases: (1) Attorney Riccio's affidavit, which conflicts with Mr. Jones's affidavit, demonstrates that Attorney Riccio advised Mr. Jones about his right to choose to testify, *see* [Dkt. 14 at 31]; and (2) Mr. Jones cannot show prejudice because he only wanted to testify to the loss amount and the Government would have questioned him on his lengthy criminal record, which undoubtedly would have been damaging to his case, *id.*

It is well-settled that a criminal defendant "has the right to take the witness stand and to testify in his or her own defense." *Bennett v. United States*, 663 F.3d

71, 84 (2d Cir. 2011) (quoting *Rock v. Arkansas*, 483 U.S. 44, 49 (1987)). The decision to testify is solely for the defendant to make, and defense counsel is tasked with the responsibility to "advis[e] the defendant of his right to testify or not to testify." *Id.* Included in counsel's duty is to "advise the defendant about the benefits and hazards of testifying and not testifying," and although counsel is permitted to "strongly advise the course that counsel thinks best" he must leave the ultimate decision to the defendant. *Id.*

Attorney Riccio submitted an affidavit indicating he believes Mr. Jones should not testify due in part because of his extensive criminal history. *See* [Dkt. 19 ¶ 6]. Attorney Riccio averred that Mr. Jones "agreed ultimately to not take the stand." *Id.* ¶ 7. This affidavit directly conflicts with Mr. Jones's declaration wherein he claims Attorney Riccio prevented him from testifying even though Attorney Riccio knew he wanted to testify, and that "[A]ttorney Riccio never explained to me anything about my rights to testify, he just wouldn't let me testify, although we had previously decided that I would." [Dkt. 5 ¶ 13, 18].

With respect to *Strickland*'s deficiency prong, the Second Circuit has upheld a district court's denial of a hearing when the only evidence supporting counsel's failure to provide the right to testify was the Mr. Jones's "own blanket statements" that he was prevented from testifying. *See Chang v. United States*, 250 F.3d 79, 84-85 (2d Cir. 2001). In *Chang*, however, the trial counsel supplemented the record with a "detailed affidavit . . . credibly describing the circumstances concerning appellant's failure to testify." *See id.* at 85. Here, Attorney Riccio's affidavit falls short of being sufficiently detailed on this issue. As a general matter, where a claim

involves "off-the-record interactions" with trial counsel, it "cannot be determined by examining the motion, files, and records before the district court." *Id.* at 85. The Court thus assumes without deciding only for the purposes of this analysis that his performance was deficient.

The Court nonetheless determines a hearing is not warranted because Mr. Jones fails to properly address the prejudice prong under *Strickland*. As Mr. Jones himself avers in his brief, counsel knew he proceeded to trial so "he could testify regarding loss amounts attributed to him, as he never denied any involvement in the offense." [Dkt. 1-1 at 20-21]. Mr. Jones does not provide the Court with any other content to which he would have testified, and accordingly the Court cannot conclude there is a reasonable probability the verdict would have been different. *See generally Brown v. Artuz*, 124 F.3d 73, 81 (2d Cir. 1997) (assessing petitioner's proposed testimony and ruling that he would not have been able to satisfy all elements of a justification defense, thereby failing to establish prejudice); *Perez v. United States*, No. 3:09cv30 (JBA), 2012 WL 1067549, at *5 (D. Conn. Mar. 30, 2012) ("Without offering any explanation as to what he would have testified about, or how that could have possibly changed the outcome of his trial, Petitioner cannot demonstrate that but for Attorney Reeve's alleged advice about his testifying, there is a reasonable probability that the outcome of the trial would have been different."). Therefore, the Court will not order a hearing or find Attorney Riccio's representation was constitutionally ineffective on this ground.

**VIII.** <u>Failure to Seek Two-Level Departure for Acceptance of Responsibility</u>

On January 3, 2011, Attorney Riccio sent a letter to Mr. Jones discussing the United States Sentencing Guidelines calculation for his charges under the original Indictment. *See* [Dkt. 14-3 (Opp'n Ex. 3, Riccio Exhibits) at 12 of PDF]. The letter informs Mr. Jones of the Government's then-pending plea agreement, which included a three-level downward adjustment for acceptance of responsibility. *See id.* at 15 of PDF. An e-mail sent by Attorney Riccio to the Government on October 6, 2011, indicates Attorney Riccio "told him that the opportunity to plead guilty and receive 3 acceptance points would close on Monday 10/10." *Id.* at 54 of PDF. Attorney Riccio did not thereafter seek a two-level downward adjustment for acceptance of responsibility in the sentencing memorandum or in objecting to the Presentence Report ("PSR"). Specifically in the sentencing memorandum, he wrote, "Mr. Jones understands that an adjustment under Guidelines § 3E1.1(b) will not occur due to his putting the Government to its burden of proving him guilty at trial." *See Williams*, [Dkt. No. 223 (Def. Sentencing Mem.) at 7]; [Dkt. 14-7 (Opp'n Ex. 7, PSR Obj.)].

Mr. Jones has not established in what way counsel's performance is deficient for recognizing the fact that Mr. Jones did not qualify for the acceptance of responsibility adjustment. Comment Two to the Sentencing Guidelines states the acceptance of responsibility adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, cmt. 2 (2011). The Commission identified

only *rare circumstances* for awarding an acceptance of responsibility adjustment despite a defendant's exercise of his right to a jury trial, included which are attempts to "assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id.* Such a determination is to be based on "pretrial statements and conduct." *Id.* Mr. Jones may have admitted his culpable conduct to his counsel, but the fact remains that he proceeded to trial leaving the Government to its burden of proof. He did not exercise his right to trial solely to preserve issues unrelated to factual guilt and therefore he cannot establish counsel's performance was deficient.

In addition, at sentencing most attorneys seek to cast their clients in a favorable light; as contrite and remorseful rather than argumentative and disrespectful of the law. Recognizing a clear and unambiguous provision of the sentencing guidelines rather than making a specious argument for an adjustment for which a client is clearly not entitled is a strategy to cast a client in the most favorable light possible in order to best assure a more lenient sentence. A reasonable strategic decision cannot form the basis or an ineffective assistance claim. *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) (applying the trial strategy principle to a § 2255 motion). Strategic trial decisions, "if reasonably made, will not constitute a basis for an ineffective assistance claim." *Nersesian*, 824 F.2d at 1321.

Moreover, the sentencing transcript makes clear that Mr. Riccio did not forego making an available argument that Mr. Jones took responsibility for his

personal conduct as he understood it. First, Attorney Riccio stated during his opening statement at sentencing that Mr. Jones "certainly accepts responsibility for the crimes that he stands charged of" and that a "[d]ispute always existed in the Government's offer of the overall scope, the overall amount, and the vastness of this conspiracy and the vastness of this activity." *See Williams*, [Dkt. 274 at 13:19-24]. Mr. Jones later gave a statement that there was no proof he broke into cars in Connecticut, *see id.* at 24:10-14, and he also opined, "I just don't want to take the punishment for what [my co-conspirators] did," *id.* at 24:21-25. This Court observed Mr. Jones "stands here today, purportedly accepting responsibility for his conduct, saying, 'I should only be sentenced on the basis of the money that was stolen either by me or when I was present, or only with the things that I stole.'" *Id.* at 30:2-9. This Court then determined a downward adjustment for acceptance of responsibility would not be warranted, "certainly not after today's statement." In his statement to the Court, Mr. Jones expressed an unwillingness to accept responsibility for the reasonably foreseeable acts of his co-conspirators in furtherance of their joint objective as required by law and explained in the Court's jury instruction. *See id.* at 36:1-4. Attorney Riccio's oral argument, Mr. Jones's subsequent statement at sentencing, and the Court's § 3553 findings on the record make clear that Attorney Riccio made the only acceptance of responsibility argument to which Mr. Jones availed himself. Mr. Jones thus cannot show that Mr. Riccio's admission of the obvious altered the outcome of his case.

IX. **Presence in Courtroom for Administration of Restitution Sentence**

Mr. Jones claims the Court ordered restitution during recess and outside Mr. Jones's presence, and that defense counsel's failure to object constituted ineffective assistance of counsel. There is no evidence to back up this claim.

On page 43 of the Sentencing Transcript, the Government requested pursuant to 18 U.S.C. § 3663A that restitution be ordered in the amount of $237,790. *Id.* at 43:5-9. This request comports with the calculations set forth in the PSR. *See Williams*, [Dkt. 216 (PSR) ¶ 40]. The Court then stated, "So ordered," and specified that restitution would be paid at $25 per week. *Id.* at 43:12-44:3. It was not until page 47 of the Sentencing Transcript that the Court took recess. Mr. Jones therefore was present when restitution was imposed upon him and defense counsel was not deficient for failing to object.

To the extent Mr. Jones also challenges his 60-month term of supervised release, the Court notes for the record that it imposed upon him a five-year period of supervised release after explicitly stating, "Sir, would you please stand." [Dkt. 274 at 38:1-7]. There is no reason to believe, in light of the Court's direction, that he was not present to receive this aspect of his sentence. Attorney Riccio did not act below the objective standard of reasonableness regarding the supervised release aspect of Mr. Jones's sentence.

X. **Failure to Impeach at Trial**

Mr. Jones claims defense counsel was ineffective in failing to impeach witnesses Deneen Johnson, Mallory Markovic, Ashley Dunn, Rebecca Souve,

Megan Fox, and Shekeira Williams through their prior inconsistent statements. *See* [Dkt. 1-1 at 31-32].

"Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature." *Nersesian*, 824 F.2d at 1321; *Eisen*, 974 F.2d at 265. Strategic trial decisions, "if reasonably made, will not constitute a basis for an ineffective assistance claim." *Id.*

Where appropriate, Attorney Riccio used prior inconsistent statements for impeachment purposes. For example, Megan Fox testified during her cross-examination that she was telling the truth during her grand jury testimony in 2009, *see* [Dkt. 265 (Tr. 11/9/11) at 121:5-9], but Attorney Riccio's questioning revealed that she "left out" certain information:

> Q: Do you remember being asked that question at the grand jury?
>
> A: Yes, and that's – I left out that I ever met a female at the grand jury to the best of my knowledge.
>
> Q: Well, I just asked you a couple of minutes ago if the responses that you gave to the questions were true, and you said they were.
>
> A: I said they were true, but I left out information.

*Id.* at 124:4-11. In another instance, Attorney Riccio impeached Ms. Souve through her inconsistent statements during her grand jury testimony and trial testimony about the color of an SUV. *See id.* at 45:23-48:15. Both lines of questioning are evidence that Attorney Riccio strategically impeached witnesses through prior inconsistent statements at points he deemed appropriate, and he reasonably and effectively used grand jury testimony to discredit trial testimony.

Mr. Jones has not demonstrated how Attorney Riccio's cross-examinations of the aforementioned witnesses were unreasonable where he did not impeach through prior inconsistent statements. The Court has reviewed the trial transcripts and finds that Attorney Riccio acted reasonably throughout each cross-examination. He strategically and systematically attacked the credibility of each witness using various cross-examination techniques that did not include prior inconsistent statements. First, Attorney Riccio used Ms. Johnson's plea agreement, cooperation, drug and alcohol use, purported dishonesty in her application for a Pell Grant, and abandonment of her child to attack the credibility of her testimony. *See* [Dkt. 262 (Tr. 11/4/11) at 281:1-319:5]. Second, he drew upon Ms. Markovic's larceny charge, drug addiction, tattoos, and unfamiliarity with Mr. Jones to challenge her credibility. *See* [Dkt. 263 (Tr. 11/7/11) at 206:1-220:9]. Third, Attorney Riccio questioned Ms. Dunn about her federal charges, drug addiction, multiple flights from the federal government, and response to subpoena to end parole, all to attack her reliability as a witness. *See* [Dkt. 264 at 95:23-100:10]. Fourth, he raised Ms. Souve's drug use, probation violations, and cooperation with the Government to attack her reliability as a witness. [Dkt. 265 at 39:10-51:23]. Fifth, Attorney Riccio challenged Ms. Fox's testimony through evidence about her drug addiction and cooperation, which she expected would enable her to avoid indictment in another case. *See* [Dkt. 265 at 118:7-133:9]. Fifth, Attorney Riccio attacked the credibility of Mrs. Williams's testimony by questioning her about her cooperation agreement, violation of the law, plea agreement, previous interviews with the police, and extensive alcohol use. *See* [Dkt. 267 at 34:10-68:24].

Without Mr. Jones presenting affirmative evidence of unreasonable conduct, the Court cannot conclude that Attorney Riccio's impeachment strategy at trial was unreasonable, deficient, or prejudicial.

## XI. Failure to Advise of Right to Plead Guilty

Mr. Jones claims that defense counsel improperly advised him with respect to his plea offer, because Attorney Riccio "advised Jones that the only way he could challenge loss amount[ ] was at a jury trial." *See* [Dkt. 1-1 at 34; Dkt. 5 ¶ 6 (declaring Attorney Riccio "told me that the only way to challenge loss amount was to proceed to a jury trial where a jury could/would determine actual loss amount")]. The Government raises the fact that Attorney Riccio provided Mr. Jones with the Government's plea offer, a detailed explanation of the Guidelines as applied to the offer, and the scope of evidence and discovery. *See* [Dkt. 14 at 40]. Attorney Riccio also attempted to negotiate down the loss amount and he submitted several memoranda to file documenting his conversations with Mr. Jones about the plea offer. *Id.* at 42.

When a defendant is deciding whether to accept a plea offer, defense counsel must balance two key principles regarding client representation. *See Purdy v. United States*, 208 F.3d 41, 44 (2d Cir. 2000). "On the one hand, defense counsel must give the client the benefit of counsel's professional advice on this crucial decision of whether to plead guilty." *Id.* (internal quotation marks omitted). This advice must include communicating the terms of the plea offer, and it may include informing defendant "of the strengths and weaknesses of the case against him" and alternative sentences absent acceptance of the plea offer. *Id.* at 45. "On

the other hand, the ultimate decision whether to plead guilty must be made by the defendant." *Id.* A lawyer cannot "coerce a client into either accepting or rejecting a plea offer." *Id.*

The manner in which counsel advises the client "enjoys a wide range of reasonableness because '[r]epresentation is an art'" and counsel can effectively assist a client in countless ways. *Id.* (quoting *Strickland*, 466 U.S. at 689, 693). Relevant information for counsel to consider in advising client are: "the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea (whether or not accompanied by an agreement with the government), the defendant's comprehension of the various factors that will inform his plea decision." *Purdy*, 208 F.3d at 45.

Attorney Riccio denies in his affidavit the allegation that he told Mr. Jones the only way to challenge the loss amount was through a trial. He avers,

> One of the issues often discussed was the amount of loss attributable to Mr. Jones. Conspiracy law was discussed in this area I explained to him how he could be held responsible for loss amounts that occurred during conspiracy. I attempted to negotiate the loss amount with the Government . . . but it did not ultimately occur because Mr. Jones wanted a trial. I did not inform him that the only way to challenge loss is to go to trial.

[Dkt. 19 at 3 of PDF]. Attorney Riccio also "advised [Mr. Jones] that the trial could very well clarify the loss amounts through witness examination" and denies that he told Mr. Jones he had nothing to lose at trial. *Id.* at 5 of PDF. In addition, Attorney Riccio "explained the strength of the Government's case and what evidence could be used to convict him at trial." *Id.* at 8 of PDF. At some point before trial, Attorney Riccio organized a reverse proffer session with the

Government to "have the Government present its view of the evidence to [Mr. Jones] which, in combination with [his] advice to plead, would change [Mr. Jones's] mind regarding trial." *Id.* at 6 of PDF. Attorney Riccio clarifies that "[i]t was after the reverse proffer where he ultimately decided that he did not want to plead guilty." *Id.*

There is objective evidence in the record to support Attorney Riccio's claims. Notably, in January 2011 Attorney Riccio circulated to Mr. Jones a detailed memorandum regarding the Government's plea offer. *See* [Dkt. 14-3 at 12 of PDF]. This memorandum explains Mr. Jones's statutory punishments; the elements of each offense and what the Government would be required to prove; the Guidelines calculation for his offenses, including his criminal history score and departures; and the Government's plea offer. *Id.* In addition, Attorney Riccio notified Mr. Jones that over 10,000 pages of discovery had been produced, he listed the material he had reviewed to date, and he indicated they could watch the listed DVD videos at the next visit. *See id.* at 18 of PDF. Attorney Riccio also explicitly requested that Mr. Jones "very carefully" review the 227 pages of police reports, which summarized the 10,000 pages of documentary evidence, and stated they would review the content at the next visit. *Id.* Enclosed with the memorandum were the indictment, discovery, proposed plea agreement, the Guidelines Sentencing Table, statutes of the charged offenses, and Guidelines § 2B1.1 and §3E1.1. *Id.* With respect to the plea offer, Attorney Riccio did articulate, "Let me be clear – I don't agree with parts of this plea agreement. We'll discuss this when I next visit." *Id.* at 17 of PDF.

Shortly before trial on September 30, 2011, Attorney Riccio wrote a memorandum to file, which documented a visit to Donald W. Wyatt Detention Facility that day. At this visit Attorney Riccio showed Mr. Jones new CDs of discovery (lasting approximately one hour) and notified Mr. Jones that Sheikera Williams would be pleading guilty on October 3, 2011. *Id.* at 50 of PDF. The memorandum indicates they "reviewed what the consequences may be to the case if Sheikera pleads guilty" and Attorney Riccio noted, "Jermaine clearly seemed concerned about her pleading guilty." *Id.* Mr. Jones was also informed that Ms. Williams potential role as a cooperating witness could lead to the possibility of four to five informants testifying against him. *Id.*

The following week on October 6, 2011, Attorney Riccio visited Mr. Jones to inform him that Ms. Williams pleaded guilty and he contemporaneously wrote another memorandum to file. *Id.* at 51 of PDF. The memorandum indicates the meeting lasted 3.5 hours. *Id.* Attorney Riccio read Ms. Williams's proffer notes to Mr. Jones but did not leave copies pursuant to an agreement with AUSA Novick, and they also reviewed proffers from witnesses likely to testify. Attorney Riccio reflected,

> I made it clear to him that this new development (i.e., Sheikera's transformation to a cooperating witness) was very concerning to me. I also made it clear that going to trial is not a good idea. I then asked Jermaine what his position is—and he didn't give a clear indication of what he wanted to do. I told him that the deadline for making a decision was Monday 10/10. I told him that I would return to the office and attempt to negotiate a lesser Guidelines range—though I advised him that I was unsure if that was possible.

*Id.* That same day he circulated an e-mail to AUSA Novick indicating he "spent virtually the entire day" with Mr. Jones and shared the proffer notes. *Id.* at 54 of

PDF. Attorney Riccio opined that Mr. Jones was "leaning towards pleading guilty" and continued his efforts to negotiate the terms of the plea offer. *Id.*

On October 13, 2011, Mr. Jones was arraigned on the Superseding Indictment. *See Williams*, [Dkt. 115]. The evidence indicates he went through the reverse proffer on the same day of the arraignment, and on that day he decided to go to trial. *See* [Dkt. 14-3 at 56 of PDF (E-mail between defense counsel)]. Subsequent e-mails sent by Attorney Riccio to AUSA Novick indicate Mr. Jones continued to elect trial over a guilty plea. *See* Dkt. 14-4 (Opp'n Ex. 4, E-mail 10/13/11); Dkt. 14-5 (E-mail 10/19/11)].

In reviewing the objective evidence, the Court concludes Attorney Riccio reasonably balanced his duties (1) to give his professional advice about whether to accept the plea offer and (2) to afford Mr. Jones the ultimate decision of whether to plead guilty. *See Purdy*, 208 F.3d at 44. On multiple occasions, Attorney Riccio reviewed substantial evidence with Mr. Jones, discussed and analyzed potential witness testimony, and made clear that he did not think trial was a good idea. [Dkt. 14-3 at 18, 50-51 of PDF]. Attorney Riccio's memorandum explaining the Guidelines calculation for the plea offer presents the Guidelines calculation of 144 to 174 months imprisonment. He arrived at this calculation by using Counts 1-70, Bank Fraud, as the base offense level. *See id.* at 15. Attorney Riccio did not provide the details about how Counts 71, Conspiracy to Commit Bank Fraud, and 72-74, Aggravated Identity Theft, factor into the sentencing range calculation. His calculations of 144 to 174 months imprisonment do, however, do appear to be

accurate and comport with the sentencing range set forth in the proposed plea agreement.

Mr. Jones cites *Raysor v. United States*, 647 F.3d 491 (2d Cir. 2011) for the proposition that the Court must conduct a hearing to gather evidence about off-the-record conversations. In *Raysor*, the Second Circuit clarified that the standard to determine the necessity of a hearing is akin to the summary judgment proceeding: "If material facts are in dispute, a hearing should usually be held, and relevant findings of fact made." *Id.* (quoting *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009)). The Second Circuit stated that where an ineffective assistance of counsel claim is based on improper advice leading to a plea offer rejection, the petitioner "must demonstrate a reasonable probability that but for the counsel's deficient performance, he would have pled guilty instead of going to trial." *Id.* at 495. Specifically, the petitioner was required to establish a *prima facie* case that he would have accepted a plea offer absent counsel's improper advice. "*Prima facie* evidence may include a petitioner's own statement, as was offered here; however, in order for the statement to be sufficiently credible to justify a full hearing, it must be accompanied by some 'objective evidence,' such as a significant sentencing disparity, that supports an inference that the petitioner would have accepted the proposed plea offer if properly advised. *Id.*; *see Puglisi*, 586 F.3d at 216 ("Thus, we have found that a petitioner's statement is sufficiently credible to warrant a hearing where it is accompanied by some 'objective evidence,' such as a significant sentencing disparity, that he or she would have accepted the proposed plea offer if properly advised.").

Unlike the petitioner in *Raysor*, who submitted an affidavit stating he would have pleaded guilty if properly advised, Mr. Jones here makes no such claim. Rather, he merely states that Attorney Riccio "provided [him] with a plea offer of the government, hereby a stipulation that the loss amount would be $1 Million,[4]" and that Attorney Riccio "never explained to me the Federal Sentencing Guidelines nor its correct application to a conviction by jury verdict or guilty plea." [Dkt. 5 ¶¶ 4, 11]. This case is therefore more aligned with *Puglisi*, wherein the Second Circuit upheld a district court's denial of an evidentiary hearing because, in relevant part, even though "appellant did submit an affidavit in support of his motion, he never stated that he would have entered a plea had he received adequate legal advice." *Puglisi*, 586 F.3d at 216. It is worth noting that the petitioner in *Puglisi* was represented by counsel and Mr. Jones is not. However, in all other respects the cases are strikingly similar in that no objective evidence in either case was relied upon to show that the petitioner would have accepted a plea offer. Indeed, at sentencing Mr. Jones continued to challenge the loss amount attributable to him. He stated, "I just don't want to take the punishment for what [my co-conspirators] did." *Id.* at 24:21-25. The plea agreement also stipulates to a loss amount *between* $400,000 and $1,000,000 and therefore when Attorney Riccio circulated the detailed letter to Mr. Jones, he was presented with sufficient information to conclude that

---

[4] The Court notes that Attorney Riccio memorandum does not indicate the plea offer required a stipulation to $1,000,000 in loss amount. Rather, Attorney Riccio indicated the loss amount stipulation would be *between* $400,000 and $1,000,000. *See* [Dkt. 14-3 at 15 of PDF].

he was not necessarily stipulating to a $1,000,000 loss amount by pleading guilty. *See* [Dkt. 14-3 at 31 of PDF].

Notably, "a significant sentencing disparity in combination with defendant's statement of his intention is sufficient to support a prejudice finding." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003). In *Pham*, the Second Circuit determined a sentencing disparity of more than double "between the high end of the government's plea offer and Pham's sentence after a trial conviction," constituted a "significant sentencing disparity." *Id.* at 182-83. Here, the disparity between the high end of the plea offer and the resulting term of imprisonment was 66 months; the plea offer rendered a range of 144 months to 174 months, and the Court sentenced Mr. Jones to 240 months. The Court imposed a below-guideline sentence, which would have been lower had the Defendant not made statements at sentencing that convinced the Court that he was more likely to recidivate, pose a danger to the community, and disrespect the law by refusing to accept responsibility for his co-conspirators' conduct in furtherance of their conspiracy. The Court has considered the sentencing disparity and does not find it warrants a hearing given Mr. Jones never professed that he would have pleaded guilty.

In summary, although Mr. Jones argues that he was improperly advised that he could challenge the loss amount only at trial, the Court finds that did not undermine the outcome of his case because there is no objective evidence indicating he would have pleaded guilty. In fact, the plain language of the plea offer leaves open the possibility that he could have challenged the loss amount at sentencing. Accordingly, he is not entitled to a hearing on this claim.

XII.    <u>Failure to Investigate and Present Defense</u>

Lastly, Mr. Jones contends defense counsel failed to investigate and conduct a reasonable defense. In particular, Mr. Jones argues, "Of the some 68 witnesses who testified, both counsels, collectively, only cross-examined approximately 18, and briefly." [Dkt. 1-1 at 39-40]. Mr. Jones then lists 11 different instances[5] where defense counsel purportedly assisted the Government. *See id.* He has not, however, provided any factual or legal basis for the Court to conclude counsel's representation fell below an "objective standard of reasonableness" for allowing the 11 instances to occur or that there was a "reasonable probability" that the results would be different absent counsel's errors. *See Strickland*, 466 U.S. at 687-88, 694.

Courts routinely hold that where "allegations with regard to alleged counsel's errors in pre-trial preparation and investigation and trial advocacy are

---

[5] These 11 examples include: "(a) permitting the Jury's copy of Government's Exhibit 301 to be "fixed" [see Day 2, November 3, 2011 @ TR. 30]; (b) permitting government witnesses to testify from notes, without objections, and more aggravatingly, permitting 8 additional exhibits to be entered, which were notes from the witnesses, without objections. [Id. @ TR 45-46]; (c) withdrawing claim that jury saw defendants in handcuffs[ ] [see Day 3, November 4, 2011 @ TR. 91]; (d) stipulating to damaging evidence[ ] [Id. @ TR. 89-91]; (e) permitting the special agent, who[ ] investigated the case and who[ ] would testify as expert witness, to remain in courtroom throughout entire trial, without sequester[;] (f) stipulating to what a government witness [Dianne Larson Lippard] a victim, would testify to [Day 5, November 8, 2011 @ TR. 11-13]; (g) stipulating to government's exhibits 154A-C and 140A-C[,] the Willingham and McGregor exhibits[ ] [Id. @ TR. 56]; (h) permitting the government to call witnesses out-of-turn[ ] [Day 7, November 10, 2011, @ TR. 243]; )i) permitting correction of error in Avid/Budget spread sheet, and its substitution[ ] [Day 9, November 15, 2011]; (j) permitting [i]nattentive jury (juror(s)) to deliberate on the case when the court specifically inquired as to this issue; and (k) permitting the government to lead its witnesses in literally hundreds of instances." *Id.* at 40.

'vague, conclusory, and unsupported by citation to the record, any affidavit, or any other source,'" ineffective assistance of counsel claims cannot be established. *Vasquez v. United States,* Nos. 96 CIV. 2104 (PKL), 91 CR. 153(PKL), 1997 WL 148812, at *12 (S.D.N.Y. Mar.28, 1997); *see also Davison v. United States,* No. 97 CR. 490 (LAP), 00 CIV. 3064 (LAP), 2001 WL 883122, at *8 (S.D.N.Y. Aug. 3, 2001) ("[B]lanket assertions against his trial counsel's performance in a self-serving affidavit," in the absence of objective evidence to support petitioner's claim, were insufficient). The Court has previously addressed several instances listed by Mr. Jones, but to the extent he raises new examples and cites to the record, the Court has evaluated these examples for deficient and prejudicial performance. The Court finds that Mr. Jones's complaints are fundamental examples of defense counsel's trial strategy. As aforementioned, a "[d]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature" and will not constitute ineffective assistance so long as they are reasonable. *Nersesian*, 824 F.2d at 1321. There is no evidence in the record that demonstrates any of counsel's trial strategies were unreasonable. Furthermore, in light of the large number of witnesses and the ample evidence presented at trial, even if counsel were to have acted deficiently as to the issues raise in this claim, the Court finds Mr. Jones has not established a reasonable likelihood that but for these claimed deficiencies there would likely have been a different outcome in light of the court's questions, admonitions and instructions to the jury both as jury selection and during the trial and the copious amount of highly credible and corroborative evidence against him.

## Conclusion

There is no need for this Court to conduct a hearing on this habeas petition. Although courts generally "look with disfavor on summary rejection of a habeas petition," *United States v. Aiello*, 900 F.2d 528, 534 (2d Cir.1990) (quotation omitted), the text of § 2255 provides that the court need not conduct a hearing where "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," 28 U.S.C. § 2255(b) (2014); *see also Aiello*, 900 F.2d at 534 (finding no reversible error in the failure to conduct a hearing where the petition omitted "meritorious allegations that can be established by competent evidence" and the district court judge that ruled on the petition also presided over petitioner's trial) (citation and internal quotations omitted). Mr. Jones is not entitled to relief on any of his 12 claims. Therefore, this Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 is DENIED. The Court denies a certificate of appealability because jurists of reason would not find this procedural ruling debatable. *See Slack v. McDaniel*, 529 U.S. 473, 478 (2000). The Court CERTIFIES under 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: January 7, 2018